**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ELISE A. CREECH,**

      **Plaintiff,**

                            **Civil Action 2:12-cv-591**

**v.**                      **Judge Edmund A. Sargus, Jr.**

                            **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final

decision of the Commissioner of Social Security  ("Commissioner") denying her applications for

social security disability insurance benefits and supplemental security income.  This matter is

before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's

Statement of Errors, the Commissioner's Memorandum in Opposition to Plaintiff's Statement of

Errors, and the administrative record.  (ECF Nos. 9, 10, and 8.)  For the reasons that follow, it is

**RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action

be **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.      BACKGROUND**

Plaintiff protectively filed her applications for benefits on October 3, 2008, alleging that

she has been disabled since March 22, 2003, at age 40.  (R. at 174-77, 178-85, 197.)  Plaintiff

alleges disability as a result of diabetes, bipolar disorder, self-mutilation, chronic obstructive

pulmonary disease, reflex sympathetic dystrophy, high blood pressure, arthritis, and undiagnosed

hearing loss in her right ear.  (R. at 203.)  Plaintiff's applications were denied initially and upon

reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

ALJ John R. Allen held a hearing on October 1, 2009, at which Plaintiff failed to appear.  (R. at

42-53.)  After the ALJ denied Plaintiff's applications for failure to appear at the hearing, the

Appeal Council remanded the matter to the ALJ on February 26, 2010.  (R. at 70-73, 134-35.)

ALJ John R. Allen held a subsequent hearing on January 24, 2011, at which Plaintiff,

represented by counsel, appeared and testified.  (R. at 27-52.)  Barry Brown, a vocational expert,

also appeared and testified at the hearing.  (R. at 52-55.)  On February 14, 2011, the ALJ issued a

decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(R. at 9-18.)  On May 11, 2012, the Appeals Council denied Plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-4.)  Plaintiff thereafter

timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.      Plaintiff's Testimony

During the administrative hearing, Plaintiff testified that she lives between her daughter's

house and her boyfriend's house.  (R. at 32-33, 45.)  She indicated that she most recently worked

as a waitress in 2008.  (R. at 37.)  According to her testimony, Plaintiff left her job because her

manager disliked the fact that she had to inject herself with needles to control her diabetes.  *Id.*

Plaintiff testified that she missed work four to six days per month.  (R. at 37-38, 49.)

Plaintiff testified that she attempted to commit suicide in September 2010.  (R. at 44.)

She also reported that as late as 2004 she had cut herself and attempted to cut her wrists.  *Id.*  She

stated that she remains in her bedroom throughout the day because she lacks a desire to talk to

anybody.  (R. at 45.)  Plaintiff testified that she last experienced a manic episode a month prior to

the hearing. (R. at 46.) She stated that her manic episodes usually last a couple of days. The frequency varies depending on her medication. Plaintiff testified that she has lost over 50 pounds in the year prior to the hearing. (R. at 41.) She further testified that she has trouble sleeping at night ant that she naps during the day. (R. at 51.)

In terms of daily activities, Plaintiff testified that she opens the door to let her dogs out. (R. at 47.) She stated that her daughter or her boyfriend prepare and bring her meals. She denied helping around the house, although she said her daughter makes her do one chore per day while she is at her house. (R. at 49.) Her daughter has to remind her to take a shower and to change her clothes. (R. at 51.)

Plaintiff testified that she had not received mental health treatment in the five or six years prior to the hearing. (R. at 42-43.) She testified that although she has struggled with alcoholism for a number of years, she last drank alcohol on July 30, 2005. (R. at 41.)

## B.    Vocational Expert Testimony

Barry Brown testified at the administrative hearing as the vocational expert ("VE"). (R. at 52-55.) The ALJ posed a series of hypothetical questions to the VE regarding Plaintiff's residual functional capacity ("RFC").[1] The VE testified that, assuming Plaintiff was limited to the assigned RFC, she would be unable to perform her past relevant work. (R. at 53.) The VE found that a person with the physical limitations offered by the ALJ could perform jobs that exist in the local and national economy. (R. at 54.) As examples, the VE indicated that such a person could perform assembler jobs, machine tender positions, or merchandise marker jobs. *Id.* The

---

[1] An RFC is the individual's ability to do physical and mental work activities on a sustained basis despite the limitations from his or her impairments. 20 C.F.R. 404.1545. Here, with respect to Plaintiff's mental limitations, the ALJ determined that her RFC limited her to simple, repetitive tasks; superficial contact with coworkers and only brief, intermittent contact with the general public; and occasional changes in work setting or assignment. (R. at 14.) In addition, the ALJ conclude that Plaintiff is precluded from fast-paced or strict time-limited tasks. *Id.*

3

ALJ asked if an individual could perform such jobs even if she naps two or three times per day and self-isolates to the point where she has no significant contact with others.  (R. at 55.)  The VE responded that she could not compete in the market with those limitations.  Finally, on cross examination the VE acknowledged that a person who missed four to six days of work per month would be precluded from working in the national economy.  *Id.*

### III.    MEDICAL RECORDS[2]

A.    **Netcare**

Plaintiff was transported to Netcare on April 3, 2004 following an incident at Doctors North Hospital.  (R. at 284.)  Plaintiff's boyfriend had purportedly dropped her off at Doctors North Hospital to visit her sister, who was admitted to that hospital for psychiatric purposes.  Plaintiff was reportedly drunk at the time.  *Id.*  She was making inappropriate comments to men in the hospital.  *Id.*  She also threatened to kill her boyfriend and anyone else who got in her way.  *Id.*  Staff at Doctors North Hospital medicated Plaintiff and transported her to Netcare.  *Id.*

Fred Lubin, LPPC assessed Plaintiff at Netcare.  Although Plaintiff was uncooperative, Mr. Lubin noted that she was experiencing a mental health crisis.  (R. at 288.)  He reported that Plaintiff "was not interested" in talking with him.  *Id.* at 284.  Plaintiff reportedly stated that her life is worthless.  She requested breakfast and her bipolar medication and indicated a desire to go back to sleep.

Mr. Luper noted provisional diagnoses of bipolar disorder; alcohol dependence; Posttraumatic Stress Disorder ("PTSD"); cannabis dependence; and borderline personality disorder.  (R. at 288-89.)  He assigned a Global Assessment of Functioning ("GAF") score of

---

[2]In her Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged physical impairments.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged mental impairments.

30.[3] Plaintiff was discharged and referred to North Central Mental Health for further treatment. (R. at 292.)

## B.     North Central Mental Health

Plaintiff presented to North Central Mental Health on May 27, 2004.  (R. at 304.) Plaintiff reportedly stated that she wanted "general help."  *Id.*  She indicated that she sought relief from symptoms of mental illness as well as health management support.  *Id.*  She was assessed for a ninety-day service plan.  (R. at 305.)  The licensed social worker ("LSW") who evaluated Plaintiff the following day reported diagnoses of bipolar disorder; PTSD, cannabis dependence; and alcohol dependence.  (R. at 303.)  She was given a GAF score of 50.[4] Plaintiff's ninety-day plan included a mental health assessment; individual and group-based community psychiatric support treatment; crisis intervention; group counseling; and case management.  (R. at 304.)

Plaintiff underwent an updated diagnostic assessment on June 16, 2004.  (R. at 296-302.) The LSW reported that Plaintiff indicated that she experienced periods in which she would be awake for days.  (R. at 296.)  During these periods, Plaintiff reported that she felt "ten feet tall and bullet-proof."  *Id.*  She also reported a tendency to overspend and issues with impulsivity.

---

[3]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 21 to 30 is indicative of "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends)."  DSM-IV-TR at 34.

[4]A GAF score of 41-50 is indicative of "severe symptoms ... or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...."  DSM-IV-TR at 34.

Plaintiff stated that her mood "plummets" after a manic episode.  *Id.*  She stated that she becomes irritable and angry during these periods, and that she cries and makes "big issues out of small issues."  *Id.*  Plaintiff also reported that she "will cut to see how far she can cut until it hurts."  *Id.*  She reported issues with abandonment, as well as experiences of violence and risky behavior.  Plaintiff reported PTSD symptoms related to physical and sexual abuse she suffered as a child and her experience of being raped as an adult.  *Id.*; R. at 301.  She reported nightmares and intrusive memories.  Plaintiff indicated sensations of hyper-vigilance, with noises startling her.  She indicated that her bipolar medication "really helps," especially with mania.  (R. at 296.) She indicated that she does not take her morning dose because it makes her too drowsy during the day, but that she maintains her evening dose.  (R. at 300.)  The LSW noted that Plaintiff demonstrated good conversational skills during the interview.  (R. at 297.)  The LSW maintained diagnoses of bipolar disorder not otherwise specified, and alcohol dependence.  *Id.*  She also affirmed the diagnoses of PTSD and borderline personality disorder.  *Id.*  Plaintiff was assigned a GAF score of 50.  (R. at 300.)

During a June 17, 2004 updated diagnoses assessment, Plaintiff admitted to a recent relapse with respect to alcohol.  *Id.* at 298.  She stated that she had run out of medication and used alcohol to help her sleep.  She reported a blackout associated with this relapse.  Plaintiff reportedly experienced blackouts in the past and stated that she becomes very angry with alcohol.  She reported withdrawal symptoms of shakiness or nausea when withdrawing.

Personnel at North Central Mental Health terminated services for Plaintiff in December 2004 after Plaintiff failed to attend group therapy.  (R. at 294.)  According to Plaintiff's chart, North Central staff last made face-to-face contact with Plaintiff on August 3, 2004.

**C.     Terry Dragash, D.O.**

Plaintiff treated with her primary care physician, Dr. Dragash, from February 2006 through at least August 2010.  (R. at 450-633, 636-39, 641-96.)  Dr. Dragash prescribed medications for Plaintiff's anxiety and bipolar disorder.  (R. at 451-52, 253, 267-73.)  In addition to her physical complaints, Plaintiff reported experiencing anxiety and depression.  (R. at 450, 453, 456, 459.)

In his early records from 2006 and 2007, Dr. Dragash consistently reported that Plaintiff presented alert and oriented with remote and recent memory intact.  (R. at 450, 453, 457, 460, 463, 466, 468, 475, 478, 481, 483, 486, 488, 491, 494, 497, 500, 502, 505, 577, 583, 601.)  In his later records spanning into 2010, Dr. Dragash consistently reported that Plaintiff presented "alert and anxious" (R. at 586, 589), or just "anxious" (R. at 607, 610, 613, 616, 642, 645, 648, 652, 655, 658, 661, 664, 667, 670, 673, 676).

**D.     Kelly A. Yee, Psy.D.**

On December 6, 2006, Dr. Yee examined Plaintiff on behalf of the state agency.  (R. at 344-52.)  Dr. Yee noted Plaintiff's social presentation as "normal but mildly anxious."  (R. at 348.)  Plaintiff reported her mood as "more manic now," with a decrease in depressive symptoms.  (R. at 348-49.)  She reported experiencing crying spells and feelings of anger approximately once per month.  (R. at 349.)  She denied suicidal ideation, but reported two previous suicide attempts, most recently in 2003 or 2004.  She reported incidents of cutting herself in the past, but attributed her behavior to medication she was taking at the time. Although she denied homicidal ideation, Plaintiff reported some thoughts of hurting others when she is "very angry."  *Id.*  She reported being easily irritated and angered.  She indicated a history

of being destructive, and stated that she has "ripped [her] clothes," though she denied experiencing such incidents in the prior two years  *Id.*  She stated that she experiences verbal outbursts two to three times per day.  She also denied posttraumatic revivification (flashback) experiences.  (R. at 350.)

Dr. Yee diagnosed Plaintiff with bipolar disorder and personality disorder with borderline independent features.  She assigned a GAF score of 58.[5]  (R. at 351.)  Dr. Yee opined that Plaintiff retains the abilities to understand and execute simple instructions and to maintain appropriate attention and concentration on simple to moderate tasks.  He further opined that Plaintiff in a position requiring very low contact with people.  She indicated that Plaintiff's depression, irritability and mania might cause her difficulties in a work environment with extended stress.  (R. at 351.)

**E.     Sudhir Dubey, Psy.D.**

On October 16, 2007, Dr. Dubey examined Plaintiff on behalf of the state agency.  (R. at 372-76.)  Plaintiff reported feeling "ok" the date of the evaluation.  (R. at 374.)  She reported experiencing mood swings about two days per week, as well as daily anxiety and feelings of panic, particularly when around people.  *Id.*  Plaintiff also reported daily crying spells, which she stated she has experienced for the last month.  *Id.*  She stated that with medications she is able to sleep six hours through the night.  She reported feelings of guilt, hopelessness and helplessness. She denied thoughts of hurting herself, suicide or homicide.  Plaintiff denied having any recurrent traumatic memories, delusions, hallucinations, depersonalization, obsessions or compulsions.  *Id.*

---

[5]A GAF score of 58 is indicative of "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

Plaintiff further reported that she is currently employed as a waitress.  (R. at 373.)  She stated that she has no difficulty retaining employment, although she reported that her physical and psychological symptoms affect her ability to work.  She reported that "people bother [her] from time to time."  (R. at 373.)

Plaintiff reported that her daily activities include cleaning the bedroom and resting at home watching television.  She reported that concentration difficulties affect her driving.  She indicated that her ability to shop, make purchases, and manage money were unaffected.  She reported talking to her mother daily.  She reported her mood as being up and down over the past ten years.  (R. at 375.)  She indicated decreased socialization and increased avoidance of others.

Dr. Dubey diagnosed Plaintiff with bipolar disorder with depressive episode, and assigned her a GAF score at 71.[6]  (R. at 375-76.)  Dr. Dubey opined that Plaintiff was mildly limited in her ability to understand, remember, and follow instructions.  (R. at 376.)  Dr. Dubey also opined that Plaintiff is able to relate to fellow workers and supervisors, concentrate to perform simple repetitive tasks, and withstand stress without impairment.  *Id.*

## F.  Michele T. Evans, Ph.D.

Dr. Evans examined Plaintiff on behalf of the state agency on February 17, 2009.  (R. at 397-407.)  During the examination, Plaintiff reported that her father had sexually abused her as a child, that her parents physically abused her as a child, that her ex-husband had physically abused her, and that she had been raped by a stranger as an adult.  (R. at 398.)  Plaintiff reported that she had a history of alcohol abuse, but that she had quit drinking three years prior to the examination.  (R. at 399.)

---

[6]A GAF score of between 71 - 80 is indicative of transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).  DSM-IV-TR at 34.

9

Plaintiff reported that she had quit her job in 2008 due to her mental health issues, including depression.  (R. at 400.)  She stated, "I did not want to get up and go to work; I did not want to take a shower; I did not want to do nothin' and I didn't know if someone would [expletive] me off, if I would hurt them."  *Id.*  Dr. Evans reported poor eye contact and inappropriate laughter.  (R. at 402.)  Plaintiff denied current suicidal thoughts but indicated that she most recently had such thoughts two months ago.  She denied current thoughts of homicide.  Dr. Evans reported "overt indications of anxiety."  *Id.*  Plaintiff was constantly moving around in her chair and shaking and bouncing her leg.  Plaintiff reported that she experiences recurrent, unexpected panic attacks with symptoms of shortness of breath, shaking, nausea, dizziness and rapid heartbeat.  She indicated that her anxiety and panic attacks worsen when she is in proximity to strangers.

Plaintiff also reported that she had experienced trauma associated with physical and sexual abuse.  (R. at 403.)  She stated that she re-experiences the traumas almost daily through nightmares and flashbacks.  Dr. Evans reported "[o]ther symptoms suggestive of posttraumatic stress disorder include avoidance of thoughts and feelings, avoidance of people and places, less interest in participating in activities, detachment from others, a restricted range of affect, problems concentrating, problems sleeping, irritability and outbursts of anger, an exaggerated startle response, and hypervigilance."  *Id.*

In terms of daily activities, Plaintiff reported that she wakes up at 7:30 or 8:00 a.m. and goes to bed at approximately 3:30 or 4:00 a.m.  *Id.*  She reported watching television, directing her daughter to let the dog out, and going to the bathroom.  She denied completing daily chores or running errands.  She indicated that her daughter sometimes has to remind her to put on clean

10

clothing and to shower.  She denied cooking, cleaning or shopping.  She stated that she cannot manage money and that her daughter has to make purchases for her.  When asked to discuss her socialization habits, Plaintiff stated, "Okay I have no friends; I have no hobbies; and I socialize with my dog."  (R. at 404.)

Dr. Evans reported that Plaintiff meets the diagnostic criteria for bipolar disorder, panic disorder with agoraphobia, PTSD, alcohol dependence in sustained full remission, and marijuana dependence in sustained full remission.  (R. at 404-05.)  She assigned a current GAF score of 43. (R. at 404.)  Dr. Evans opined that Plaintiff suffers extreme impairment in her ability to relate to others, including fellow workers and supervisors, and to withstand the stress and pressure associated with day-to-day work activity.  (R. at 405-06.)  She concluded that Plaintiff's mental health symptomology causes marked impairment in her ability to understand, remember, and follow instructions and to maintain the attention, concentration, persistence and pace required to perform routine tasks.  She also found that Plaintiff lacked the mental ability to manage her own funds.  (R. at 406.)

### G.     Leslie Rudy, Ph.D./Marianne Collins, Ph.D.

In March 2009, after review of Plaintiff's medical record, Dr. Rudy, a state agency psychologist, assessed Plaintiff's mental health condition.  (R. at 423-41.)  Dr. Rudy concluded that Plaintiff had moderate restrictions of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace.  (R. at 438.)  She also found that Plaintiff suffered no episodes of decompensation.

Dr. Rudy discounted Dr. Evans findings, concluding that Plaintiff's reported symptoms contained in Dr. Evans' report were inconsistent with the objective medical evidence.  (R. at

427.)  Specifically, Dr. Rudy indicated that although Plaintiff reported that she does not leave her house independently and has frequent panic attacks, "there is no mention of being accompanied or allegations of ongoing anxiety symptoms in her primary care physician (and med [sic] prescriber) office notes."[7]  *Id.*  Dr. Rudy ultimately concluded that Plaintiff retains the capacity for simple repetitive tasks in a nonpublic setting without demands for fast pace, high production or frequent changes in assigned tasks.  *Id.*  She also opined that Plaintiff "can interact on a superficial basis with familiar others but would not tolerate demands for sustained cooperative interactions or close, over-the-shoulder interactions."  *Id.*

## H.   Mount Carmel Hospital

Plaintiff was admitted to Mount Carmel Hospital on September 15, 2010.  She complained that "[she] was just overwhelmed."  She intentionally took an overdose of medication following an argument with her boyfriend.  (R. at 706.)  She stated that she was trying to kill herself, but that she was now concerned that her boyfriend might try to kill her dog.  (R. at 716.)  She asked to go home.  *Id.*  She denied further self-harmful thoughts.  (R. at 706.)  She was assigned a GAF score of 20 on admission.  (R. at 707.)

Plaintiff was discharged the following day with instructions to contact a mental health center "to be linked with services."  (R. at 703.)  She was also instructed to "use the list provided to obtain treatment for your substance abuse."  *Id.*  Plaintiff was diagnosed with adjustment disorder with mixed emotional conduct disturbance; bipolar disorder; opiate dependence; alcohol dependence; personality disorder, with borderline features; and status post-overdose.  (R. at 707.)

---

[7]Earlier in her report Dr. Rudy made the following notation with respect to Plaintiff's primary care physician: "Unfortunately, office notes seem to be a template with little variation and no significant mental status information documented."  (R. at 426.)

## IV.  THE ADMINISTRATIVE DECISION

On February 14, 2011, the ALJ issued his decision.  (R. at 6-18.)  At step one of the

sequential evaluation process,[8] the ALJ found that Plaintiff had not engaged in substantial

gainful activity since March 22, 2003, the alleged onset date.  (R. at 11.)  At step two, the ALJ

concluded that Plaintiff had the severe impairments of chronic renal disease; chronic right foot

pain with reflex sympathetic dystrophy raised as a "possible" diagnosis; diabetes mellitus; mild

degenerative disc disease of the lumbar spine; bipolar disorder; borderline personality disorder;

depression; and polysubstance (alcohol, opioid, cannabis) dependence in full remission.  *Id.*  At

step three, the ALJ further concluded that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 12.)  The ALJ evaluated Plaintiff's residual functional

capacity ("RFC") at step four of the sequential evaluation process as follows:

> After careful consideration of the entire record, the undersigned finds that the

---

[8] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or
   equal the criteria of an impairment set forth in the Commissioner's Listing of
   Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

13

claimant has the residual functional capacity to perform less than the full-range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following abilities and limitations: (1) able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) able to sit, stand or walk for 6 hours in an 8-hour workday; (3) precluded from climbing ladders, ropes or scaffolds; (4) able to frequently balance, stoop, kneel, crouch, and crawl; (5) precluded from concentrated exposure to smoke, fumes, gasses, and dust; (6) limited to simple, repetitive tasks; (7) precluded from fast-paced or strict time-limited tasks; (8) limited to superficial contact with coworkers and only brief, intermittent contact with the general public; and (9) able to tolerate occasional changes in work setting or assignment.

(R. at 14.)  In reaching this determination, the ALJ afforded "great weight" to the opinions of Drs. Rudy and Collins, finding their assessments to be consistent with and supported by the record as a whole.  (R. at 16-17.)  The ALJ afforded "some weight" to the psychological opinions of consultative examiners, Drs. Yee and Dubey, finding their assessments consistent with the record as a whole.  (R. at 17.)  Finally, the ALJ afforded "little weight" to the psychological opinion of consultative examiner, Dr. Evans, finding that "it is more limiting than can be supported by the record."  *Id.*  The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  (R. at 15.)  He found her statements concerning the intensity, persistence and limiting effects of the symptoms, however, lacking in credibility to the extent they were inconsistent with his RFC.  *Id.*

Relying on the VE's testimony, the ALJ concluded that there exist jobs in significant numbers in the state and national economy that Plaintiff can perform.  (R. at 17-18.)  Consequently, he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 18.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. LEGAL ANALYSIS

Plaintiff raises numerous challenges to the ALJ's decision, including that it is not supported by substantial evidence because the ALJ failed to consider Plaintiff's PTSD. (Statement of Errors, 15, ECF No. 9.)  The Undersigned agrees.[9]

The ALJ is required to consider all objective medical evidence in the record where such evidence is produced by an acceptable medical source.  20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513; *Minor v. Comm'r of Soc. Sec.*, No. 12-1268, 2013 WL 264348, *16 (6th Cir. Jan. 24, 2013).  In addition, in formulating a RFC, the ALJ is required to consider "all the relevant medical and other evidence in [the] case record," including evidence of impairments that are not considered to be "severe" at step two of the sequential evaluation process.  20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184 at *5 (1996)) ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'") (emphasis in original).  A failure of the ALJ to consider all of a claimant's records or symptoms in developing an RFC generally constitutes reversible error.  *Cf Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. 2012) (finding no reversible error in the RFC determination "because the ALJ considered all of the symptoms that were consistent with the medical evidence in determining his residual functional capacity"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (concluding that reversal is required where the

---

[9]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  The Court notes, however, Plaintiff's contentions that the ALJ failed to weigh the medical opinion evidence properly, specifically, the opinions of Dr. Evans and the consultative psychologist, appear to be an opposite side to the same coin.  Yet, the Undersigned need not, and does not, resolve the alternative bases that Plaintiff asserts support reversal and remand.

agency fails to follow its own procedural regulations where the regulation is intended to protect claimants). Further, "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson*, 378 F.3d at 545. Even if the aggrieved party appears to have little chance of success on the merits, courts generally will not find the procedural error to be harmless. *Id.* at 546. "To hold otherwise . . . would afford the Commissioner the ability to violate the regulations with impunity and render the protections promised therein illusory." *Id.*

Here, the ALJ failed even to mention Plaintiff's PTSD at all in his decision, despite its prevalence in the record. The record contains reports from seven examining sources bearing on Plaintiff's mental health. (R. at 283-92; 293-305; 344-52; 372-76; 397-407; 450-633.) Of those seven sources, three contain explicit diagnoses of PTSD. *See* R. at 288-89 (Netcare); 300 (North Central); 404-05 (Dr. Evans). Although two of the remaining three sources do not contain specific diagnoses of PTSD, they both reflect the physical, mental and sexual abuse that Plaintiff suffered in the past.[10] *See* R. at 346 (Dr. Yee noting reports that Plaintiff's parents mentally and physically abused her, on one occasion breaking her nose, and that her father molested her); 372 (Dr. Dubey noting reports of mental, sexual and physical abuse by a family member). This abuse was the basis from which at least one other examining source concluded that Plaintiff suffers from PTSD. *See* R. at 403 (Dr. Evans finding that the trauma of physical and sexual abuse as a child, as well as the experience of being raped as an adult, gave rise to Plaintiff's PTSD symptoms).[11] Consequently, PTSD, its symptoms and its potential causes are well-

---

[10]In addition, one of these opinions references a history of PTSD. *See* R. at 345 (Dr. Yee noting that Plaintiff underwent counseling as a child "secondary to 'PTSD'").

[11]The last of the seven sources to reference Plaintiff's mental health was her primary care physician, Dr. Dragash. Although his records contain neither a diagnoses of PTSD nor reports of the abuse Plaintiff suffered as a child and adult, his records consist of a template and contain little to no discussion of Plaintiff's conditions, mental or otherwise. Indeed, one of the agency reviewing sources recognized the minimal probative value that these records offer. *See* R. at 426

documented in the record, which, at minimum, renders PTSD worthy of mention in the ALJ's decision.  Nevertheless, the decision lacks any indication that the ALJ considered this impairment at all.  In failing to consider Plaintiff's impairment in assessing her RFC, the ALJ failed to comply with agency regulations, which warrants reversal.  *Wilson*, 378 F.3d at 544.

Defendant's contrary arguments are not well taken.  First, Defendant argues that the ALJ's failure to specifically mention PTSD at step four did not constitute error because he explicitly stated that he considered all of Plaintiff's mental impairments, "singly and in combination," in developing the RFC.  (Op. 11, ECF No. 10.)  Generally, an ALJ does not err in failing to mention each impairment at step four so long as he explicitly states that he considered the impairments singly and in combination in developing the RFC.  *See Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.").  This is not the case, however, where the ALJ wholesale fails to consider an impairment, particularly when its diagnoses and limitations appear in a significant portion of the pertinent records.  *Cf. id.* (noting the several ways in which the ALJ considered the impairments at issue at other points in the decision-making process); *McDaniel v. Astrue*, No. 1:10-cv-699, 2011 WL 5913973, *6 (S.D. Ohio Nov. 28, 2011) (finding no error where the ALJ "discussed every impairment advanced" by the plaintiff and stated that he considered the combined effects of these impairments).  Here, on the other hand, there is no indication in the ALJ's decision that he even knew of Plaintiff's PTSD, despite its prevalence in the mental health records, much less that he considered it.

---

("Unfortunately, office notes [of Dr. Dragash] seem to be a template wi[th] little variation and no significant mental status information documented.").

Defendant next suggests that the ALJ did not err because the RFC accounts for any limitations that Plaintiff's purported PTSD might pose. (Op. 12-13, ECF No. 10.) But it is by no means clear from the ALJ's decision that the RFC accounts for limitations imposed by PTSD. This case does not present an example where a plaintiff claims that the ALJ failed to consider her carpal tunnel syndrome, but the RFC includes restrictions related to the use of her hands. *See Kirkland v. Astrue*, No. 3:10-cv-2693, 2012 WL 2064536, *7 (S.D. Ohio June 7, 2012) (rejecting the plaintiff's argument that ALJ failed to consider non-severe impairment of carpal tunnel syndrome where the RFC included limitations on lifting and carrying in difference to the plaintiff's diagnoses).

Finally, Defendant urges the Court to affirm her decision because Plaintiff has failed to demonstrate how her PTSD symptoms should have affected the ALJ's RFC analysis. (Op. 12, ECF No. 10.) In support of her position, Defendant relies on *Cooper v. Astrue*, No. 10-cv-168, 2011 WL 1118514 (S.D. Ohio. Jan. 25, 2011) and *Hixson v. Comm'r of Soc. Sec.*, No. 11-10509, 2012 WL 3278973 (E.D. Mich. Feb. 2, 2012). In both of those cases, however, the ALJ specifically considered the impairment at issue, rendering the cases distinguishable and inapposite here. *See Cooper*, 2011 WL 1118514, at *6 ("Plaintiff concedes that the ALJ explicitly considered his [degenerative disc disease] at the fourth step of the sequence."); *Hixon*, 2012 WL 3278973, at *12 (noting that the ALJ merely failed to consider the impairment "in detail"). Moreover, in *Hixon* the plaintiff was unable to point to a specific doctor-imposed limitation in the record related to her impairment. *Id.* Here, however, not only did three examining sources diagnose Plaintiff with PTSD, but one of them specifically incorporated the

diagnoses into the limitations she imposed. *See* R. at 404-06 (setting forth the limitations imposed by Dr. Evans).[12]

Accordingly, the ALJ failed to mention Plaintiff's PTSD at all in his decision. Consequently, there is no indication that the ALJ considered whether Plaintiff's PTSD poses any limiting effects, and, if so, whether such effects were incorporated into the RFC assessment. It is, therefore, **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that this action be **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

## VII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g., Pfahler v. Nat'l Latex*

---

[12]Defendant also points out that Plaintiff denied "post traumatic revivication experiences" or other symptoms related to PTSD to two state agency examining sources, and that she did not include PTSD on her application for benefits. (Op. 4-5, 8-9, ECF No. 10.) Still, the ALJ's failure to even mention PTSD in his decision, despite its repeated surfacing in the record, deprives this Court of the ability to conduct a meaningful review of the decision. *See Miller v. Comm'r of Soc. Sec.*, 181 F. Supp. 2d 816, 820 (S.D. Ohio 2001) ("In the absence of such a discussion [as to whether impairments meet any of the Listings], the Court cannot conduct a meaningful review of the record, for it is unclear precisely *why*, in the ALJ's view, plaintiff did not satisfy [the Listings].") To be clear, although the Undersigned makes no determination either way, it may very well turn out that reconsideration of the record and Plaintiff's alleged PTSD leads to a finding of non-disability. This Court, however, cannot meaningfully review the Commissioner's decision when it wholesale fails to account for a documented impairment.

*Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 11, 2013                                  /s/ *Elizabeth A. Preston Deavers*
                                            Elizabeth A. Preston Deavers
                                            United States Magistrate Judge